IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 9, 2025

**BENJAMIN HARTSHAW v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Rutherford County**
**No. 79617      James A. Turner, Judge**

_____

**No. M2024-01885-CCA-R3-PC**

_____

The petitioner, Benjamin Hartshaw, appeals the denial of his petition for post-conviction relief, arguing the post-conviction court erred in finding he received the effective assistance of counsel. Following our review, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

James M. Judkins, Murfreesboro, Tennessee, for the appellant, Benjamin Hartshaw.

Jonathan Skrmetti, Attorney General and Reporter; William C. Lundy, Assistant Attorney General; Jennings H. Jones, District Attorney General; and Sharon Reddick, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

***Facts and Procedural History***

On October 15, 2020, the petitioner was convicted by a Rutherford County jury of six counts of rape of a child and four counts of aggravated sexual battery for which he received an effective sentence of forty-six years. The petitioner appealed his conviction. On October 4, 2022, this Court affirmed that conviction. *See State v. Hartshaw*, No. M2021-01231-CCA-R3-CD, 2022 WL 4963712, *1 (Tenn. Crim. App. Oct. 4, 2022).

The facts giving rise to the petitioner's conviction were summarized by this Court on direct appeal as follows[1]:

> At the trial, the victim testified that she was at her aunt, A.W.'s house on the morning of March 20, 2018. The victim said that her younger sister, R.,[2] and her then-eight-year-old aunt, M.M., were also present, and that adult family members came and went during the day. The victim said that before dinner, her grandmother and A.W. left the home to go to Walmart for groceries, leaving the [petitioner] alone with the three minor children. The victim said she was in a back bedroom playing with R. and M.M. and that the [petitioner] called her into a front bedroom that was used as a living room. She said the [petitioner] stated she was his favorite niece and asked if he were her favorite. She said the [petitioner] referred to an earlier conversation the victim had with her grandmother, her mother, and her aunt regarding the victim's behavior, which included sexual activity with a juvenile boy. The victim said that the [petitioner] stated that he wanted to see if the victim knew what she was doing and that he told her to suck his penis. She said that when she refused, the [petitioner] stated that it was okay because they were not related by blood. She said the [petitioner] forced her to perform fellatio by pushing her head down. She said he threatened her that he would hurt her if she told anyone. She said he also pulled up her shirt, pulled down her bra, sucked her nipples, and touched her breasts. She said he instructed her to lie on a couch face down, pulled down her pants, and had penile/vaginal intercourse with her. She said he stopped and inserted his fingers in her vagina. The victim said she called her grandmother to inquire when the grandmother and the aunt would be home. She said the [petitioner] stated he wished the other adults would leave more often so he could have sex with her more frequently. The victim said the [petitioner] had sex with her again, although she did not provide details of this encounter. The victim said the [petitioner] stopped when the victim's grandmother called to tell the children to come outside to carry in groceries. The victim said her mother picked up R. and the victim that night.

> The victim testified that on the next day, March 21, 2018, her mother took her to her aunt's house after a dentist appointment. The victim said she had wanted to go to work with her mother, rather than returning to her aunt's house, because she had not wanted to be alone with the [petitioner]. The

---

[1]We limit our recitation of the facts to those relevant to the petitioner's issues on appeal.

[2] It is the policy of this Court to refer to minors by their initials. Only R.'s first name appears in the record. Thus, we have identified her by a single initial.

victim said that her grandmother, the [petitioner], and M.M. were also present when she arrived. The victim said that during the day, the [petitioner] called her to the back door and offered for her to smoke cigarettes with him. She said she declined. She said she and the [petitioner] eventually went into the living room, where she played with toys until the [petitioner] asked her to suck his penis and stated it would be a present for his birthday, which was the next day. She said that despite her refusal, the [petitioner] forced her to perform fellatio. She said he sucked her nipples and groped her breasts. She said that he told her to lie on the couch and that he had penile/vaginal intercourse with her. She said that the [petitioner] stopped and that she thought he heard footsteps. She said that she and the [petitioner] sat up on the couch and that M.M. came into the room to get something and left. She said the [petitioner] inserted his fingers in her vagina. She said the assaults continued "on and off" until her aunt and uncle returned home.

The victim testified that on the evening of March 21, 2018, the adults present in her aunt's home were going to play cards. She said that the [petitioner] was in the front room setting up the card table and that he called M.M. into the room. She said she stated under her breath, "[W]hy, so you can do the same thing you did to me?" She said the [petitioner] had not understood her but thought she had an "attitude." She said her grandmother told her to leave the room because the adults were going to play cards. She did not recall the [petitioner] threatening to "whoop" her if she did not leave the room.

The victim testified that she went into the back room with M.M. and R. She said she told M.M. to get her mother, A.W. The victim said that her grandmother came into the room and that she revealed the abuse to her grandmother and later to A.W. The victim said she told her mother about the abuse later that evening.

. . . .

A social worker from Our Kids testified that the victim was examined and interviewed on March 22, 2018. She recounted the victim's statement, in which the victim reported sexual abuse on a Tuesday and a Wednesday. The victim reported that on Tuesday, the acts had been penile/oral penetration, penile/genital penetration, digital/genital penetration, digital/breast contact, and oral breast contact. She reported that on Wednesday, the acts had been penile/oral penetration, penile/genital penetration, digital/genital penetration, digital/breast contact, and attempted oral/oral contact. The victim reported

that the [petitioner] committed the acts on the first day while the victim's grandmother and aunt were out of the home. The victim reported consensual sex with another minor on March 2 and 3, 2018. The victim's mother had reported the victim's previous diagnoses of ADHD, depression, and oppositional defiant disorder.

. . . .

TBI Special Agent Forensic Scientist Lisa Burgee, an expert in forensic serology and DNA testing, testified that a sample she examined of the inside front of the victim's bra contained alpha-amylase, which is found in human saliva. She said that upon further testing, she detected a DNA mixture of two individuals. She said that if one DNA profile was presumed to be that of the victim, the other profile was consistent with the [petitioner's] DNA profile. She said it was unlikely that the DNA was present due to secondary transfer and that it was more likely that the DNA on the bra was from the [petitioner's] saliva than from another source. She acknowledged that the possibility of DNA transfer from one person to another increased as two individuals spent time around each other.

Agent Burgee did additional testing. Presumptive testing for the presence of semen was negative for samples from the victim's underwear, sweatpants, shirt, and hoodie. Male DNA was identified through Y-STR testing on swabs of the victim's inner and outer labial areas collected during the rape kit examination. Agent Burgee was unable to develop a complete DNA profile due to the small amounts of DNA present. She did not conduct Y-STR testing for the presence of male DNA on the victim's clothing items.

. . . .

The [petitioner] testified that on March 21, 2018, the victim's mother brought the victim to stay at A.W.'s house while the victim's mother was at work. He said he was never alone with the victim that day. He later said, however, that he had been at the back door smoking when the victim approached him and pulled a half-smoked Maverick cigarette from her bra and asked him for a light. He said that he told the victim she was too young to smoke and that she responded that her mother was aware she smoked. He said he told her to ask her mother for a light and to "get out of [his] face." He said the victim stomped off and yelled that she was tired of people telling her what to do and ruining her life. The [petitioner] stated that he smoked one-half of a cigarette at a time and that his half cigarettes had been "coming up

- 4 -

missing" since the victim's arrival that day. He said that he smoked Maverick cigarettes and that A.M. smoked Newport cigarettes.

The [petitioner] testified that on the evening of March 21, 2018, he had been outside smoking in A.M.'s van with the other adults and that he went inside with A.W.'s husband to set up the card game. He said he told the children to get out of the living room and to go to the back room. He said the victim looked angry and did not go when the other children left. He said he told her he would give her a "whooping" if she did not go. He said the victim became enraged and cried. He said she stated that she hated him and his family. The [petitioner] said the victim raised the sexual abuse allegations five to ten minutes later.

The [petitioner] testified that after the allegations were made, he spoke to Detective Yates voluntarily. He said he had not mentioned anything about cigarettes and that Detective Yates had not asked him about cigarettes or mentioned DNA testing. He said that Detective Yates questioned him about the victim's being "flirty" and "fast" and that Detective Yates had been the one to mention this. He did not recall having said that the victim "knows the game" and probably would have liked for him to have done things to her, but he acknowledged that he probably said this to Detective Yates. He said he told Detective Yates about threatening to "whoop" the victim for not leaving the room and about the victim's "running around" with boys. He did not recall having told Detective Yates that he was never alone with any of the children. He said that if he had said this, he had believed at the time that A.W.'s husband had been home.

The [petitioner] acknowledged that he had seen the adult women having a conversation with the victim but said he had not overheard what was said.

The [petitioner] testified that he took medication which made him impotent and that he had not been sexually active in March 2018. He denied any sexual contact or activity with the victim. He said he first mentioned the cigarette incident to his attorney and thought he mentioned it after learning of the DNA results.

Dr. William Watson, an expert in DNA and serology, testified that the likelihood of DNA transfer increased the more two people were around one another. Regarding the DNA results obtained by the TBI laboratory, Dr. Watson said the amount of male DNA recovered on the inner and outer labial

swabs was very small and might be accounted for by a shared bathroom or by transfer from a surface. He said there was no way to tell if the DNA was present due to sexual activity. Regarding the male DNA from the victim's bra, he said the [petitioner's] having licked the victim's breasts was one possible mode by which the DNA might have been deposited. He said, however, that other modes of transfer might account for the presence of the male DNA. He said these possibilities might include transfer from the victim's taking a half-smoked cigarette belonging to the [petitioner] out of her bra.

Detective Yates testified as a rebuttal witness that the [petitioner] told him that the [petitioner] had never been alone with the children. He said the [petitioner] had blamed the victim and called her flirty. Detective Yates said the [petitioner] never mentioned the victim's having a cigarette and trying to smoke with him.

*Id.* at 1-7

Following the denial of his direct appeal, the petitioner filed a pro se petition for post-conviction relief on February 22, 2023. On March 2, 2023, counsel was appointed, and on February 2, 2024, an amended petition for post-conviction relief was filed. Although the petitioner raised numerous claims in his petition and at the evidentiary hearing, he confines himself to two issues on appeal, arguing trial counsel was ineffective (1) for failing to prepare the defense's DNA expert and (2) for failing to object to a "sleeping juror" during the trial. An evidentiary hearing was held on November 1, 2024, during which trial counsel and the petitioner testified.[3]

Trial counsel testified that in preparation of the case, he focused on obtaining an expert to rebut the State's DNA evidence, believing a DNA expert to be the most beneficial in establishing the petitioner's innocence. To accomplish this, trial counsel sought and secured the services of Dr. William Watson. After reviewing the State's evidence and meeting with trial counsel several times, Dr. Watson generated a report challenging the State's DNA evidence and conclusions.

When questioned about Dr. Watson's expert report and testimony, trial counsel admitted that he could not recall all the specifics from either and that mistakes were made. However, trial counsel testified that he "thought [Dr. Watson] testified well." When

---

[3] We limit our recitation of the testimony at the evidentiary hearing to that relevant to petitioner's issues on appeal.

questioned generally about the mistakes made by Dr. Watson, trial counsel agreed "there was [sic] a couple errors in his report that obviously should have been caught prior to trial to avoid that." Additionally, trial counsel agreed that "little mistakes here and there could affect the jury's decision" and that "anything certainly could go to the credibility of the witness"; however, on cross-examination, trial counsel testified that notwithstanding the mistakes in the report, Dr. Watson's ultimate findings were still valid and that his opinions were unchanged by the State's cross-examination. Trial counsel, however, did not speak with the jurors after trial and, thus, did not know if Dr. Watson's errors had any effect on his credibility with the jury.

Regarding the petitioner's claim that some of the jurors were sleeping during the trial, trial counsel recalled that the petitioner indicated to him on more than one occasion that members of the jury were asleep. However, trial counsel never personally observed any of the jurors sleeping during the trial.

The petitioner testified that he noticed members of the jury sleeping several times during the trial. He notified trial counsel, but trial counsel failed to object. The petitioner testified that on one occasion trial counsel stated, "[w]ell, if we lose, that's something we can bring up on the appeal."

After its review of the evidence presented, the post-conviction court denied relief, and this timely appeal followed.

*Analysis*

On appeal, the petitioner argues trial counsel was ineffective (1) for failing to properly prepare the DNA expert and (2) for failing to object to a "sleeping juror." The petitioner alleges the cumulative effect of the trial counsel's deficient representation resulted in prejudice. The State responds that the post-conviction court properly found that trial counsel was not deficient and that the petitioner suffered no prejudice.

The petitioner bears the burden of proving his post-conviction factual allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f). The findings of fact established at a post-conviction evidentiary hearing are conclusive on appeal unless the evidence preponderates against them. *Tidwell v. State*, 922 S.W.2d 497, 500 (Tenn. 1996). This Court will not reweigh or reevaluate evidence of purely factual issues. *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997).

The issue of ineffective assistance of counsel presents mixed questions of fact and law. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Thus, this Court reviews the petitioner's post-conviction allegations *de novo,* affording a presumption of correctness

only to the post-conviction court's findings of fact.  *Id*.; *Burns v. State*, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner must show both that counsel's performance was deficient, and that counsel's deficient performance prejudiced the outcome of the proceedings.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the standard for determining ineffective assistance of counsel applied in federal cases is also applied in Tennessee).  The *Strickland* standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.  In order for a post-conviction petitioner to succeed, both prongs of the *Strickland* test must be satisfied.  *Id*.  Thus, courts are not required to even "address both components of the inquiry if the defendant makes an insufficient showing on one."  *Id*.; *see also Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996) (stating that "a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

A petitioner proves a deficiency by showing "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms."  *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688; *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)).  The prejudice prong of the *Strickland* test is satisfied when the petitioner shows there is a reasonable probability, or "a probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694.  However, "[b]ecause of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"  *Id*. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

## I.    Preparation of the DNA Expert Witness

The petitioner contends trial counsel was ineffective because he failed to properly prepare the defense's DNA expert, Dr. Watson.  Specifically, petitioner points to errors in Dr. Watson's report regarding (1) the testing methodology of the victim's bra; (2) the dates of the DNA collection; and (3) the mistakes relating to quantitative values.  The petitioner claims that because these errors were highlighted at trial by the State during cross-examination, the collective effect of the errors "likely diminished the witness's credibility."

Initially, we note that despite his claim on appeal that Dr. Watson made several errors in his report and at trial, the entirety of the petitioner's questioning of trial counsel during the post-conviction hearing concerning Dr. Watson amounted to no more than two pages of transcript and consisted of the following exchange:

Q:  Okay. All right.

And just to kind of plow up some of these errors that Dr. Watson made, Mr. Clarke, do you remember at one point where Dr. Watson had stated that he believed the bra was cut but, in reality, it had not been cut?

A:  No. I don't recall specifics of it but, again, I would defer, obviously, to whatever is in the transcript would be what was testified to.

Q:  Okay. I believe there were -- do you recall there being any mistakes with quantitative values and DNA issues?

A:  Again, I don't remember the specifics of it.

Q:  Okay. Do you recall on page 158 of the transcript for transcript III, Trial Volume III where there was an indication that -- well, how about I just read it to you.

Page 158, "Okay. You say additionally, the evaluation of the evidence is also complicated by the fact that there is no question that the alleged victim was in physical contact with the alleged perpetrator prior to the outcry. So, what contact are you specifically referring to?"

And then Dr. Watson answers, "Just the standard interaction. Being in the same place, sitting on the same couch, whatever sort of regular interaction they would have had during the time that they" would have been around each other.

Question, this is by, I believe, Ms. Davis, "But you don't say interaction. You say physical contact. You said, there's no question the victim was in physical contact with the Defendant. What are you referring to? What physical contact are you referring to?" And then the question was " -- the alleged victim was in physical contact?" And then Dr. Watson's answer, I believe, was "I don't know that there was physical contact. So, we can contribute that to poor choice of words on my part."

Do you agree that it says that?

A: I agree that that's what the transcript says, yes.

Q: Okay.

A: I'm not going to disagree with anything in the transcript, just for reference.

Q: Okay. But you can understand how little mistakes here and there could affect the jury's decision?

A: Certainly. Yeah. Anything certainly could go to the credibility of the witness, yes.

Furthermore, while the petitioner both at the post-conviction hearing and now on appeal refers to the trial transcript, the transcript was not made an exhibit to the post-conviction hearing and was not referenced by the post-conviction court's order denying post-conviction relief. Thus, we have nothing with which to review the random references and overly broad questions presented during the post-conviction hearing.

At the post-conviction hearing, trial counsel conceded there were errors in Dr. Watson's report that should have been caught prior to trial. However, he did not remember "specifics" related to "mistakes with quantitative values," and the petitioner failed to point out these mistakes during his questioning of trial counsel at the post-conviction hearing. Moreover, he was not questioned concerning the other errors noted above other than his choice of wording concerning "physical contact" versus "standard interaction." Despite admitting there were mistakes in Dr. Watson's report, trial counsel indicated that Dr. Watson's expert opinion remained valid. Furthermore, even the State's expert agreed with Dr. Watson's conclusion "that the possibility of DNA transfer from one person to another increased as two individuals spent time around each other."

In addition to the sparse questioning about Dr. Watson's report and testimony, the petitioner, as found by the post-conviction court, failed to "present any proof that another expert, or a properly prepared expert, could have provided testimony that would have led to a different outcome in the trial." In short, the post-conviction court found that the petitioner failed to present "clear and convincing proof that [trial counsel's] preparation of the witness fell below the range of competence demanded of attorneys in criminal cases" and, therefore, even if trial counsel were deficient in preparing Dr. Watson for trial, the petitioner failed to prove he was prejudiced by trial counsel's representation. The record does not preponderate against this finding. *See Tidwell*, 922 S.W.2d at 500. Therefore, the petitioner has failed to meet the burden required of him and is not entitled to relief on this issue.

## II. Objection to Sleeping Juror

The petitioner also contends trial counsel was ineffective for failing to object to a sleeping juror. However, the petitioner failed to establish by clear and convincing evidence that any members of the juror were asleep during trial. At the evidentiary hearing, trial counsel testified that he did not observe any jurors sleeping during the trial despite the petitioner telling him such was the case. As the post-conviction court found, the petitioner was the only person claiming to have witnessed a juror sleeping during the trial. The post-conviction court accredited the testimony of trial counsel, noting "that in order to make a finding, by clear and convincing evidence, that jurors were sleeping, the [c]ourt would have to completely discount [trial counsel's] testimony on this issue. The [c]ourt will not do this." "Questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the [post-conviction court]." *Fields*, 40 S.W.3d at 456. As such, the post-conviction court determined that the petitioner failed to prove his factual allegation of a sleeping juror by clear and convincing evidence and, therefore, failed to establish deficient performance on the part of trial counsel. Nothing in the record preponderates against that finding. *See Tidwell*, 922 S.W.2d at 500. Accordingly, the petitioner is not entitled to relief.

### *Conclusion*

Based on the foregoing authorities and reasoning, the judgment of the post-conviction court is affirmed.

s/ J. ROSS DYER
_____
J. ROSS DYER, JUDGE

- 11 -